**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- X

LAUREN BONNER,                                      :
                                                    :
       Plaintiff,   :  Civil Action No.
                                                    :
   v.                                 :
                                                    :
POINT72 ASSET MANAGEMENT, L.P.,                     :  **COMPLAINT**
STEVEN A. COHEN, in his individual and              :
professional capacity, and DOUGLAS D.               :
HAYNES, in his individual and professional          :  **Jury Trial Demanded**
capacity,                                           :
                                                    :
      Defendants.     :
-------------------------------------------------------------- X

   Plaintiff Lauren Bonner ("Plaintiff"), by and through her undersigned counsel, Wigdor

LLP, as against Defendants Point72 Asset Management, L.P. ("Point72," "P72" or the

"Company"), Steven A. Cohen ("Cohen") and Douglas D. Haynes ("Haynes") (together,

"Defendants"), hereby alleges as follows:

**SUMMARY OF CLAIMS**

"The reality is that this is just a really tough place for
women and that's not going to change."

-- Kevin O'Connor, Chief Legal Officer for Point72

**The "PUSSY Board" at Point72**

   1.  For several weeks, the whiteboard hanging on the wall of Douglas Haynes's

office included the word "**PUSSY**" written across it.

   The Year:    2017.

   The Company:  Point72, the "family office" founded by billionaire Steven A.
            Cohen after insider trading charges decimated his former hedge
            fund, S.A.C. Capital Advisors.

   The Owner:   Douglas D. Haynes, President of Point72.

2.      In his capacity as President of Point72, Haynes believed it was both acceptable and appropriate for him to write the word "**PUSSY**" on the whiteboard hanging in his office and leave it there for _**weeks**_.  During this time, female employees were humiliated and ashamed as they were forced to work and participate in meetings held in Haynes's office, including with other male executives, as the **PUSSY Board** drifted above them, taunting them with repulsive references to their own bodies.  No female employee should be forced to endure such sexist and misogynist treatment during one office meeting, much less multiple meetings over the course of several weeks.

3.      Shockingly, such injustice is common at Point72 where male executives flout gender discrimination laws and openly subject their female subordinates to abhorrent bias.  Unfortunately, Lauren Bonner is one of the Point72 female employees forced to endure such treatment on a regular basis.

**"Do You Want to Fuck Her?"**

4.      In 2017, Ms. Bonner attended a fundraiser with many Point72 executives, including a highly paid P72 consultant and close business associate of Cohen's, Dave Black ("Black").  Because of Black's close relationship with Cohen, Ms. Bonner understood that she was expected to show him professional respect.

5.      While Ms. Bonner conversed with Justin Lubell, a high-ranking portfolio manager at Point72, Black walked over with a woman that neither Ms. Bonner nor Mr. Lubell knew.  After Black's female friend eventually moved to another conversation, Mr. Lubell innocently asked Black about the identity of Black's companion.  Shockingly, Black said:

> **"Why? Do you want to fuck her?  <u>You can, she works for me</u>."**

6.      Ms. Bonner and Mr. Lubell stood by in horror, unable to speak.  It is against this backdrop that Ms. Bonner and other female employees at Point72 must navigate their work environment.

**"No Girls Allowed"**

7.      While the above-described behavior is both repulsive and obviously discriminatory, it is a symptom of Point72's firm-wide practice of refusing to elevate capable women to leadership and decision making roles.

8.      By way of example only, of the 125 Portfolio Managers that Point 72 employs, it is believed that all but one are men.  Of the thirty to thirty-two Managing Directors, only one is a woman.[1]

9.      Likewise, the Company's **"Investment Professional"** hiring committee is comprised ***exclusively*** of men, and male executives at the Company have openly stated that they "refuse to hire women," disingenuously claiming that their "wives won't let them."

10.      Thus, it should be no surprise that, despite the fact that women who make it to the second round of the Point72 interview process are far more qualified than the men who make it to the second round, the less qualified male candidates are hired at a 2:1 ratio over the more qualified female candidates.

11.      This discriminatory sentiment is reflected most recently in P72's 2017 hiring decisions.  Only 21% of the new hires in 2017 are women.  Of the women that were hired, none were hired as Portfolio Managers or Managing Directors, and only one was brought in as a Director.  By comparison, *14* men were brought in as Directors in 2017.

---

[1]      As such, use of the qualifying word "male" in reference to Portfolio Managers and Managing Directors is redundant and therefore omitted throughout this Complaint.

12.     The structural sexism at Point72 also causes women to be routinely denied promotions and regularly forced out after male executives accuse them of being "too emotional," "too sensitive" or simply, "women."   In fact, incredibly, **after** Ms. Bonner filed a complaint against Seetharam Gorre, a high-ranking male executive at the Company, Gorre was permitted to sit on the promotion committee responsible for determining whether Ms. Bonner would be promoted, and prevented her from being promoted on the transparently pretextual, disingenuous and discriminatory grounds that she was "too aggressive."   Of course, for men, aggression is seen as a positive in promotion decisions, and men at the Company are encouraged to be more aggressive.

13.     Discrimination permeates the P72 environment so deeply that high level employees and executives are comfortable openly and explicitly expressing their disdain for women.   By way of example, a number of male Portfolio Managers openly declare that they simply will not consider hiring women to work on their teams, and it is common knowledge that "women will be paid less" at Point72.   Equally horrific, Tim Shaughnessy, Point72's Chief Operating Officer, regularly calls female employees "girls" and openly holds meetings in advance of which he declares, "**no girls allowed**."

14.     To make matters worse, the few women that are hired by P72 earn substantially less than their male counterparts, at times earning **_less than 50 cents for each dollar_** earned by men, and sometimes as little as one-third of what men earn.

15.     Ms. Bonner refuses to stand by in silence while the male leadership continues its merciless behavior that runs counter to the law, and reinforces the marginalization and degradation of female employees.   By this lawsuit, Ms. Bonner seeks to hold accountable

Point72, Cohen, Haynes and other executives for their shameful and unlawful conduct, and take immediate steps to halt the continued harassment of their female employees.

16.     P72 knows about such unlawful practices, as men at senior executive levels engage without even attempting to hide their unlawful conduct.  By actively protecting men who discriminate against women, P72 has sent the message that complaining is meaningless.  In fact, ratification of such unlawful and discriminatory conduct by senior-level executives at Point72 puts vulnerable women at risk for subsequent instances of discrimination, as the men who engage in such practices know that they will not face consequences.  That ends now.

17.     Because of Point72's lawlessness, Ms. Bonner is forced to seek redress for her harm through the legal system.

18.     This case is important precisely because it shows that, in 2018, wealthy, financially sophisticated, global companies such as Point72 continue to believe that they operate above the law.  As long as Point72 is allowed to do so, it will continue to abuse its female employees and operate in a manner allowing them to resort to dirty, illegal tactics to keep women from succeeding.  Rather than learning from past failures to supervise potential wrongdoing, P72's conduct shows that earning profits trumps any need to follow statutory rules, including the applicable discrimination laws.

## ADMINISTRATIVE PROCEDURES

19.     Plaintiff will be filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and will file an Amended Complaint alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII") following the EEOC's issuance of a Notice of Right to Sue.

20.     After commencement of this action, a copy of this Complaint will be served on the New York City Commission on Human Rights and the Office of Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

21.     Any and all other prerequisites to the filing of this suit have been met.

## JURISDICTION AND VENUE

22.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the deprivation of Plaintiff's rights under the Equal Pay Act.  The Court has supplemental jurisdiction over Plaintiffs' related claims arising under State and local law pursuant to 28 U.S.C. § 1367(a).

23.     Pursuant to 28 U.S.C. § 1391 and 29 U.S.C. § 1132(e), venue is proper in this district because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

24.     Plaintiff Lauren Bonner is a female Associate Director at Point72, and has been employed at Point72 since August 2016.  Ms. Bonner is a resident of the State of New York, and at all relevant times met the definition of an "employee" or "eligible employee" under all applicable statutes.

25.     Defendant Point72 Asset Management, L.P. is a domestic business corporation with a principal place of business at 72 Cummings Point Road, Stamford, CT 06902, as well as additional New York-based offices located at 510 Madison Avenue, New York, NY 10022 and 330 Madison Avenue, New York, NY 10017.  At all relevant times, Defendant Point 72 Asset Management, L.P. met the definition of Ms. Bonner's "employer" under all relevant statutes.

26.     Defendant Steven A. Cohen is a resident of the State of Connecticut and is the Chairman and Chief Executive Officer of Point72.  At all relevant times, Defendant Cohen met the definition of Ms. Bonner's "employer" under all relevant statutes.  Defendant Cohen participated in, ratified and/or approved the discriminatory decisions described herein, including pay and promotion decisions affecting Ms. Bonner.

27.     Defendant Douglas D. Haynes is a resident of the State of New York and the President of Point72.  At all relevant times, Defendant Haynes met the definition of Ms. Bonner's "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

### Point72's Background

28.     Point72 is not just *any* global asset management firm.  Started on April 7, 2014, Point72 is the entity that Cohen initially created in order to invest his own wealth, which is estimated at more than $11 billion.

29.     In 2013, the U.S. Attorney's Office indicted Cohen's hedge fund S.A.C. Capital Advisors ("SAC") and charged it with insider trading, wire-fraud and civil money-laundering. By that time, eight SAC executives had already pleaded guilty to insider trading, and some had been sentenced to jail.

30.     Although Cohen escaped criminal charges, as part of a deal reached between the U.S. Attorney's Office and SAC, Cohen agreed to dismantle SAC and restrict his investing work to funds from his own private "family" wealth.

31.     To accomplish this accommodation, Cohen opened P72, where he serves as the Chairman and CEO, Haynes serves as President, Mark Herr ("Herr") serves as Managing Director and Head of Corporate Communications, Johnathan Jones ("Jones") serves as Director

and Head of Investment Talent Development, and Tim Shaughnessy ("Shaughnessy") serves as Chief Operating Officer.

32.     Cohen's agreement to not invest money from anyone outside of his family was limited to two years.  Accordingly, as of January 1, 2018, Point72 is free to invest outside money.  Today, the company employs over 1000 individuals in six countries.

**Point72's Façade of Ethical Standards**

33.     Self-labeled as both a "family office" and a "world-class investment management organization," P72 claims that it adheres to the "highest ethical standards."

34.     In an attempt to suggest that it has moved on from its internal compliance problems and regulatory disobedience, P72 presents to the public the following mission and values:

Mission

- To be the industry's premier asset management firm through delivering superior risk-adjusted returns, adhering to the highest ethical standards and offering the greatest opportunities to the industry's brightest talent.

Values

- We are professionals who conduct ourselves ethically and with integrity at all times.

- We operate as one firm, dedicated to succeeding together, with mutual respect and commitment.

- We are not satisfied with the status quo and are committed to pursuing innovation and excellence.

- We work together to advance our professional and personal development.

- We are exemplary citizens of the world and contribute to the communities in which we live and work.

35.     P72's façade of ethics and integrity is belied, however, by the fact that male executives feel emboldened to admit that they "refuse to hire women" to work on their teams.

Ethical standards are absent when professional female employees are paid substantially less than their male peers are simply because P72 gets away with it.  Mutual respect is nonexistent when the word "**PUSSY**" remains on Haynes' whiteboard for weeks, and female employees openly recognize and discuss the fact that as long as Haynes is President at P72, "women will be paid less."  P72 fails to advance the professional and personal development of its female employees when it actively excludes them from senior decision-making roles and promotes men with less experience and fewer qualifications over women that are more qualified.  There is nothing ethical about the Chief Operating Officer openly referring to women as "girls" and blatantly denying women access to events because he says that "no girls [are] allowed."  Exemplary managers do not call female employees "sweetheart" rather than using their names.

36.     Despite such adversity, last spring Ms. Bonner told Jones, Director and Head of Investment Talent Development ("ITD"), and Human Resources ("HR") about unacceptable behavior by Seetharam Gorre ("Gorre"), Managing Director and Head of Information Technology ("IT").  After regularly enduring his insults and humiliation, including in front of subordinate male employees, she felt there was no choice but to speak up.  Gorre's behavior was so offensive that Ms. Bonner said she did not feel comfortable meeting with him one-on-one.  Incredulously, P72 allowed Gorre to participate on the very committee tasked with the decision of whether to promote Ms. Bonner this fall (the "promotion committee").  She recently learned that the promotion committee labeled her as abrasive and too aggressive.

37.     At the same time that P72 allows male executives to indulge themselves in unfettered discrimination, P72 also allows these men and other employees complicit in the wrongdoing to go unpunished – leaving them free to continue an upward trajectory at the Company.  Undeniably, P72 has betrayed its female employees, including Ms. Bonner, and any

ethical standards or internal company values or morals to which the company purports to adhere are nothing more than a blatant façade.

**Ms. Bonner's Employment and Discriminatory Underpayment at Point72**

38.     In July 2016, Ms. Bonner accepted an offer to work as an Associate Director, reporting to Jones, at Point72, in New York, New York and Stamford, Connecticut.

39.     Presently, Ms. Bonner runs Point72's Talent Analytics team and manages fourteen individuals.  Ms. Bonner's 2017 compensation target was $300,000 base and $150,000 bonus, with 20% bonus deferred for three years and invested at P72.  Ms. Bonner's 2018 target compensation is $300,000 base and $225,000 bonus.

40.     Ms. Bonner's reviews are stellar.  Indeed, Because of Ms. Bonner's exceptional performance, the Company paid her an additional bonus of nine percent of her total compensation.  Moreover, Ms. Bonner created an industry-leading technology platform that leaders at P72 have described as nothing less than a "breakthrough" and massively innovative.

41.     Despite Ms. Bonner's cutting-edge innovations and the fact that employees at all levels respect Ms. Bonner and value her work, P72 has failed time and again to promote Ms. Bonner to Director, a promotion that was discussed as early as the time of her hire in July 2016.

42.     In declining to initially hire Ms. Bonner as a Director, P72 disingenuously informed her that no one at her level had that title.

43.     Contrary to P72's representations, Joel Barron is a Director at P72, despite the fact that his responsibilities are similar to those of the engineers that report to Ms. Bonner, rather than to Ms. Bonner's more substantial responsibilities.  Likewise, James Fontelieu is a Director despite the fact that he is technically junior to Ms. Bonner.

44.     Furthermore, despite the fact that a recent hire named Evan Anger ("Anger") is unequivocally less experienced and less qualified than Ms. Bonner, he was hired as a Director and is ***paid*** ███████████████

45.     Anger came to P72 from Two Sigma where he ran a subset of recruiting – a position that Ms. Bonner handled more than five years ago at a larger and more prestigious firm. At P72, Anger is slated to manage six to nine individuals, as compared to the fourteen individuals currently under Ms. Bonner.

46.     Unconsciably, ████████████████████████████████



████████████████████████  Additionally, P72 agreed to pay ████████

███████████████████████, placing his anticipated start date at the Company at April 2018.

47.     By way of another example, in April 2017, J.T. Shields ("Shields") began working at P72 under Jones.

48.     P72 hired Shields from The Blackstone Group, where he worked on the multi-manager fund Senfina Advisors LLC ("Senfina").

49.     Shields was responsible for hiring many of the individuals that were responsible for Senfina incurring double-digit losses in 2016.

50.     Despite coming from a fund down 24 percent, P72 hired Shields as a Director and agreed to pay him ████████, with the expectation that Shields would hire portfolio managers that could deliver large gains.

51.     Shamefully, ████████████████████████████████

████████████████████████████while she manages her team of fourteen individuals.

52.     Furthermore, in 2017, P72 hired Ami Goldfein ("Goldfein") from Och-Ziff Capital Management Group LLC ("Och-Ziff"), a firm that was rocked by scandal surrounding a five-year bribery probe and which suffered massive withdrawals in 2016.

53.     Notably, while searching for a third member of the team to which Goldfein was ultimately hired, P72 *__exclusively__* considered male candidates based upon Jones's belief that the team was "too female" and that P72 needed to have "grown-ups in the room."

54.     Despite the fact that Goldfein was responsible for investor relations at Och-Ziff, and notwithstanding his weakened bargaining position, P72 agreed to compensate Goldfein at rate of ███████████████.

55.     Therefore, █████████████████████████████████████████.

56.     As alleged in more depth below, Ms. Bonner is not alone in being discriminatorily underpaid, as Point72 discriminatorily underpays women across the board in comparison to their similarly situated male counterparts, including two women who are paid significantly less than Goldfein despite performing identical roles.

57.     To that end, this is but a mere sampling of myriad male employees at P72 who earn substantially more money – despite the fact that they bear far less responsibility and are substantially less qualified – than their female counterparts.

**P72's Failure to Promote Ms. Bonner and Gorre's Retaliation Against Her**

58.     P72 has repeatedly opted to pass over women eligible for promotions to Director, managing directors and sector executive levels, while instead choosing men – including less qualified men – to fill such positions.

59.     Despite Ms. Bonner's achievements in successfully creating a groundbreaking technology platform for P72, she was rewarded with a discriminatory decision to not promote her to Director.

60.     Humiliatingly, when Ms. Bonner was informed that she was once again passed over for a promotion to Director, Jones disingenuously told her that "titles are not important" at P72.

61.     Indeed, titles at Point72 have a direct impact on compensation, including an employee's opportunity to receive larger bonuses.

62.     Jones (parroting what the committee told him) informed Ms. Bonner that the promotion committee denied her a Director role because it was the opinion of certain committee members that she was too aggressive and abrasive, phrases that are seldom, if ever, used to describe her male counterparts in a negative light.

63.     To the contrary, this purported justification is plainly discriminatory considering the fact that Haynes regularly tells male employees to be "***more*** aggressive" or to "**break more china**," and P72 actively represents that it seeks to hire individuals that are "strong," "robust" and "rigorous."

64.     Similarly to the way Ms. Bonner has been described, Senior Executive Mark Flannery previously stated that he did not wish to proceed with consideration of hiring a female portfolio manager because of her "forceful personality."

65.     Although P72 perpetuates a degree of mystery about the membership of the promotion committee, upon information and belief, there is only one female member and at least thirteen male members.

66.     The hollowness of Jones's proffered excuse for refusing to promote Ms. Bonner is underscored by Gorre's presence on the promotion committee, which eviscerates any credible claim of reasonable objectivity.

67.     By including Gorre on the promotion committee, and allowing him to have a say in whether Ms. Bonner was promoted to Director, not only did Point72 fail to discipline Gorre for his blatantly sexist and demeaning conduct, but the Company actually provided him *carte blanche* to further damage Ms. Bonner for complaining about him.

68.     Gorre did little to hide the fact that he was upset that Ms. Bonner created an industry-leading technology platform, and he repeatedly looked for ways to unfairly critique her performance and complain about her purported incompetence.

69.     Although Ms. Bonner repeatedly raised her concerns about Gorre's unrelenting conduct to Jones, who in turn spoke to Shaughnessy about Gorre's conduct, nothing was ultimately done.  P72's decision to look the other way allowed Gorre countless opportunities to retaliate and further harm Ms. Bonner – which he did.

**Systemic Institutional Bias at P72**

      **A.**    **The "Inexorable Zero" Inference and Unequal Pay**

70.     The presence of internal compliance monitors at P72 has failed to correct the glaring male-centric leadership and corresponding inequities imposed on female employees.

71.     To that end, P72's Chief Legal Officer, Kevin O'Connor ("O'Connor") has specifically stated, "**the reality is that this is just a really tough place for women and that's not going to change.**"

72.     When the numbers are adjusted to exclude female employees performing administrative and clerical positions, men occupy more than 81% of the professional positions at P72.  At all incremental levels, this percentage increases with leadership responsibilities.

73.     Out of approximately 125 Portfolio Managers ("PM"), only one is a woman, within another woman serving as a "developmental PM."

74.     Accordingly, <u>less than one percent (1%) of P72's Portfolio Managers are female</u>.

75.     Out of the approximately thirty to thirty-two Managing Directors ("MD"), only one is a woman.

76.     Accordingly, <u>less than three percent (3%) of P72's Managing Directors are female</u>.

77.     Until August 2017, when Sara Vavra joined the firm policy committee – the Company's most senior decision making committee – not one female served on the committee.

78.     The Company's "Investment Professional" hiring committee – a committee that is responsible for over 75 hires per year – is comprised ***exclusively*** of men.

79.     The Company's "9s Committee" – the committee responsible for deciding which senior analysts should be promoted to the PM position – is comprised of seven members, of which ***only one*** is a woman.

80.     Most recently, despite only being with the Company for approximate six months, Goldfein was made a member of the 9s Committee, while more experienced and qualified women were passed over.

81.     Not one female is on the Company's board of advisors.

82.     Such a gross absence of women from senior management effectively proves discrimination on its face without the need for statistical or other evidence.  In *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 342 n.23 (1977), the Supreme Court explained that there was no way to explain away a complete lack of women in leadership, writing, "the

company's inability to rebut the inference of discrimination came not from a misuse of statistics but from the '**inexorable zero**.'"

83.     It is within this context that P72's systemic, gender-based discrimination has developed and flourished.  The discriminatory employment practices that disproportionately affected Ms. Bonner's compensation and that of other professional women at P72 include, *inter alia*:  (i) a discretionary performance evaluation system that disfavors female employees; (ii) a discretionary compensation system that disfavors female employees; and (iii) a discretionary promotion system that disfavors female employees.

**B.     P72 Systemically Discriminates Against All Female Hires**

84.     Not surprisingly, Ms. Bonner is not alone in being discriminatorily underpaid by P72, as the Company pays other qualified women at similarly abhorrent discounts as compared to their male counterparts.

85.     By way of example only, in ITD alone, P72 pays two other equally qualified women substantially less than Goldfein, despite the fact that they perform identical roles.

86.     Likewise, these women are paid pennies on the dollar relative to their responsibilities and performance when compared to certain recently hired males, including Anger and Shields.

87.     Upon information and belief, there are men at P72 who earn up to 95% more than the women in non-administrative roles who report directly to them.

88.     Notably, Haynes oversees compensation for employees and has the authority to establish values regardless of Jones's proposed amounts.

89.     Haynes, with the approval and ratification of Cohen, specifically decided Ms. Bonner's level of compensation with full knowledge that her similarly situated male counterparts earned significantly more than she did.

90.     With zero meaningful power and influence over critical decisions at P72, female employees are left to simply agree that they will receive 40 to 60 cents for each dollar that their male peers receive, or leave.

91.     Likewise, the male-dominant systems in place at P72 ensure that female employees will never complain (at least aloud) or band together to assert their rights as guaranteed by federal law.

92.     Absent meaningful change at P72, the falsity of P72's mission and values will be further exposed, and Ms. Bonner and similarly-situated female employees will undoubtedly continue to experience the following discrimination:

- Unequal base salary for substantially the same work as compared to men;

- Unequal bonuses for substantially the same work as compared to men;

- Unequal benefits and other forms of compensation as compared to men;

- Unequal opportunities for advancement as compared to men;

- Unequal opportunities for development as compared to men; and

- Unequal performance evaluations as compared to men.

93.     Moreover, not only are women virtually absent from senior-level positions, but those that are present are mistreated and not respected by their male counterparts, and Ms. Bonner has witnessed other executive females be subjected to heightened criticism and inequalities as compared to their male peers.

94.     For example, Haynes openly referred to one former female executive as "**a dumb blonde**" and routinely and brazenly disparaged her weight.

95.     Likewise, despite at least one other woman's exemplary performance, she has been denied equal opportunities for advancement and development as compared to men. Although this woman is considered immensely talented among her peers, P72 failed to promote her to an MD position and instead, offered her the opportunity to move to Singapore without the MD title.  Upon information and belief, executives at international offices at this woman's level are all MDs.

96.     Furthermore, Haynes made another female employee draft a PowerPoint presentation **_less than 48 hours after giving birth_**, as well as participate in a conference call.

97.     While the same employee was re-negotiating her compensation, O'Connor and Mike Butler, head of HR, told her that she was getting "too aggressive and emotional," and that she could take what she had been offered or leave the Company.

98.     On other occasions, male employees have attempted to pass off their own duties to junior female employees while maintaining their perceived high performance levels.  For example,  after Shields started at P72, he complained to Jones that he had too much work to do in connection with absorbing work from the due diligence team.  In response, Jones wanted Ms. Bonner to take over some of Shields's work.  Despite this skewed level of responsibility and his title as Director, Ms. Bonner was expected to pick up Shields's slack and then get paid ███████ ██████████████████████████████████████.

99.     Recently, Ms. Bonner has heard male executives complain that Ms. Vavra, a new sector executive, is "too aggressive" and is building her team in an aggressive manner.  P72 hired Ms. Vavra to expeditiously grow a Macro team.  All other sector executives are male.

**C.     Point72's Systemic Hiring Bias Extends to Recruiting Efforts**

100.     Pursuant to the protocols in place for campus recruiting, applicants to P72 must submit information about their grades, standardized testing and work experience.

18

101. Thereafter, P72 selects individuals to be invited to participate in further stages of the interview process, which includes submitting videos of applicants answering specific questions posed by P72.

102. After review of the videos, P72 selects individuals to come in for a personal interview or telephone interview.

103. Although, upon information and belief, more males than females apply for positions at P72, the bar for female applicants is raised, requiring women to demonstrate GPAs and standardized test scores that are higher than those of similarly-situated men before they can even qualify for the second stage of the interview process.

104. Upon information and belief, despite women moving on to the second stage with higher qualifications than similarly-situated men, P72 rejects women after interviews at a higher rate than men are rejected.

105. Specifically, P72 advances 25% of female candidates, who are already more qualified, and 34% of less qualified male candidates, ultimately resulting in P72 hiring a disproportionately greater number of male applicants.

106. Indeed, P72's General Counsel, O'Connor, has stated that he only hires people after having beers with them and "**talking man to man**."

107. Not surprisingly, such disparate practices trickle down to the hiring practices of P72's summer analyst/intern program.

108. For example, upon information and belief, although there were an equal number of men and women candidates coming out of a competition related to the 2018 summer internship program, P72 extended offers to candidates at a male to female ratio of 2:1.

D.     **P72's Institutional Biases Create a Discriminatory Work Environment**

109.    Painfully, the exclusively male leadership's sexist, gender based conduct at P72 has fostered a boys' club atmosphere where Ms. Bonner and other female employees experience sexist and discriminatory conduct that has and continues to result in a discriminatory and hostile environment for women, in which they are devalued, marginalized and disparaged.

110.    Moreover, upon information and belief, P72 has never promoted a black employee to PM or MD.

111.    To that end, despite Ms. Bonner's role as a co-chair of P72's diversity committee, she and her co-chair were obstructed in their efforts to obtain and analyze certain data concerning compensation breakdowns by gender and ethnicity at P72.

112.    To begin, Ms. Bonner and her co-chair had to make repeated requests before they were permitted to review any data at all regarding gender and ethnicity at P72.  When they were finally permitted to review data regarding gender and ethnicity breakdowns at P72, they were not even permitted to distribute it to the rest of the diversity committee.  Instead, they were only permitted to flash the data in a difficult to read format on a computer screen for a brief review.  Moreover, O'Connor specifically told them not to share any such data with the Company's policy committee or leadership team.

113.    Furthermore, although Ms. Bonner and her co-chair repeatedly requested access to data regarding pay based on ethnicity and gender, each such request was denied and, therefore, no meaningful analysis regarding pay inequity could possibly be performed.

114.    Because P72 fails to give female employees the means to report unlawful discrimination in an effective manner, Ms. Bonner and other employees understand that the price to pay for complaining is severe.  Should women dare to report gender bias, they expect to be

discredited, victim blamed and retaliated against for speaking out.  Each time P72 insulates male employees from discipline for their unlawful acts, women are harmed.

115.    In fact, female employees have reported sexual harassment to male executives and to HR with distressing results.

116.    By way of example only, one professional female who recently dared to report sexual harassment by a male co-worker was met with a number of incredulous excuses for the male employee's conduct, including suggestions that he may have some sort of disability that would "explain" his unlawful conduct.

117.    Rather than terminating the male employee or subjecting him to tangible discipline, P72 opted to pass over this woman for a promotion.

118.    Likewise, Herr, the Head of Communications, has had multiple harassment complaints lodged against him, yet remains in a senior role at P72, as HR has simply stated to those who complain, "**don't bother pursuing this**."

**Open Toleration and Ratification of Discrimination**

119.    The fact that a number of male senior executives openly disfavor women is common knowledge at P72, and the examples of such discrimination are seemingly endless.  By way of example only:

> a.    Male executives, including both current and former PMs, openly state that they will not hire women to be on their teams, stating, *inter alia*, that they cannot hire women because their "wives would not let them," and women are "too emotional" and not team players.  To that end, Director Jaimi Goodfriend confided in Plaintiff that a number of male former PMs told her that they will not hire women because they will not be "**culture fits**" and "not successful on the team." As previously noted, women make up less than 1% of P72's Portfolio Manager workforce.

> b.    Ms. Bonner and other female employees are subjected to traditionally gender-specific topics including, *inter alia*, questions about children, whether they intended to have children, questions

about marriage and comments such as "why are you not married yet?"

c.    Male executives, including both Haynes and Herr, regularly offer unsolicited opinions about whether particular women are "attractive" or "look good," and otherwise comment on the physique of female employees, including making comments about whether female employees look "old," look older now than when they started at P72, or are "too skinny" or "blonde."  These comments objectify and marginalize female employees, their female co-workers and women generally, as it likely goes without saying that executives do not express opinions about whether male employees are "attractive," "skinny" or "blonde."

d.    Haynes has complimented Ms. Bonner on her professional attire many times, routinely doing so in a transparent effort to humiliate his assistant based on her professional attire.

e.    Male executives, including Herr, openly discuss discriminatory reasons why they believe women do not succeed at P72, including, *inter alia* , because **women w ant to have children** , are **too emotional** and can be "**hysterical**," care more about "**work lif e balance**" issues, and, perhaps most upsettingly, **do not w ork as hard as men**.

120.    P72's duplicity regarding the development and advancement of female employees is further demonstrated by the events that took place at the women's "leadership summit" held in October 2016 at Cohen's home.

121.    Female employees were forced to listen to advice from Keith Ablow ("Ablow"), a contributor on Fox News, who made repeated offensive remarks about women, including referring to Hilary Clinton as an "accomplished man's *wife.*"

122.    Ablow further advised the women who work at P72 to be "more emotional" and bring their personal lives to work.

123.    After Ablow chastised Soledad O'Brien for allegedly interrupting him and not listening, the summit chair effectively shut down the meeting.

124.    Likewise, in 2017, Ms. Bonner attended a fundraising event with many P72 executives, including a highly paid P72 consultant and close business associate of Cohen's, Dave Black.  Because of Black's relationship with Cohen, Ms. Bonner understood that she was expected to show him professional respect.

125.    While Ms. Bonner conversed with Justin Lubell, a high-ranking portfolio manager at Point72, Black walked over with a woman that Ms. Bonner and Mr. Lubell did not know.

126.    When Black's female friend eventually moved on to another conversation, Mr. Lubell innocently asked Black about the identity of his acquaintance.  Shockingly, Black said:

**"Why? Do you want to fuck her?  <u>You can, she works for me</u>."**

127.    Ms. Bonner and Mr. Lubell stood by in horror, unable to speak.  It is against this backdrop that Ms. Bonner and other female employees at Point72 must navigate their work environment.

<u>**FIRST CAUSE OF ACTION**</u>
**(Violations of the Equal Pay Act)**
***Against all Defendants***

128.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

129.    During the period of employment of Plaintiff, Defendants were subject to the provisions of the Equal Pay Act, 29 U.S.C. §§ 206 *et seq*.  During that time, Defendants required Plaintiff to perform the same or substantially the same job position as male employees, requiring equal skill, effort, and responsibility under similar working conditions at the same establishment, and paid Plaintiff at a rate of pay, including salary and bonus, less than such male employees. The differential rate of pay was not part of or occasioned by a seniority system, merit system, a system based on the quantity or quality of production, or upon a factor other than gender.

130.    Defendants engaged in patterns, practices and/or policies of employment which willfully discriminated against Plaintiff on the basis of her gender and by paying Plaintiff a lesser rate of pay, including salary and bonus, than that paid to male employees performing the same or substantially similar job duties which require equal skill, effort, and responsibility, and under the same working conditions and at the same establishments.

131.    By the actions described above, among others, Defendants have violated the Equal Pay Act, 29 U.S.C. §206 *et seq.*

132.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the Equal Pay Act, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

133.    Plaintiff is further entitled to liquidated damages, reasonable costs and attorneys' fees.

### SECOND CAUSE OF ACTION
**(Violations of New York Labor Law Equal Pay Law)**
***Against all Defendants***

134.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

135.    During the period of employment of Plaintiff, Defendants were subject to the provisions of the New York Labor Law § 194.  During that time, Defendants required Plaintiff to perform the same or substantially the same job position as male employees, requiring equal skill, effort, and responsibility under similar working conditions at the same establishment, and paid Plaintiff and at a rate of pay, including salary and bonus, less than such male employees.  The differential rate of pay was not part of or occasioned by a seniority system, merit system, a

system based on the quantity or quality of production, or upon a bona fide factor other than gender, such as education, training or experience.

136.    Defendants engaged in patterns, practices and/or policies of employment which willfully discriminated against Plaintiff on the basis of her gender by paying Plaintiff a lesser rate of pay, including salary and bonus, than that paid to male employees performing the same or substantially similar job duties which require equal skill, effort and responsibility, and under the same working conditions and at the same establishment.

137.    By the actions described above, among others, Defendants have violated the New York Labor Law.

138.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the New York Labor Law, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

139.    Plaintiff is further entitled to liquidated damages, reasonable costs and attorneys' fees.

### THIRD CAUSE OF ACTION
**(Gender Discrimination Under the NYSHRL)**
*Against all Defendants*

140.    Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

141.    Defendants have discriminated against Plaintiff on the basis of her gender in violation of the New York State Human Rights Law ("NYSHRL") by subjecting her to disparate treatment based upon her gender, including, but not limited to, denying her equal terms and conditions of employment, and subjecting her to disparate working terms and conditions while Plaintiff was working in Point72's offices in New York.

142.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

143.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

### FOURTH CAUSE OF ACTION
**(Retaliation in Violation of the NYSHRL)**
*Against All Defendants*

144.    Plaintiff hereby repeats and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

145.    Ms. Bonner complained of Gorre's offensive and inappropriate behavior, including his regular practice of insulting and humiliating Ms. Bonner in front of subordinate male employees.  Ms. Bonner also complained to her supervisor about the fact that she was not promoted and was paid less because she is a woman.

146.    Despite Ms. Bonner's complaints about Gorre, he was permitted to remain on the promotion committee, which would ultimately decide whether Ms. Bonner would be promoted to Director.

147.    Ms. Bonner was ultimately denied a promotion to Director, a decision over which Gorre maintained a leadership role and was intricately involved, and through which Gorre retaliated against Ms. Bonner for having complained about his inappropriate and unlawful conduct.

148.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

149.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress to which she is entitled to an award of monetary damages and other relief.

### FIFTH CAUSE OF ACTION
**(Aiding and Abetting in Violation of the NYSHRL)**
*Against Defendants Cohen and Haynes*

150.     Plaintiff hereby repeats and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

151.     Defendants Cohen and Haynes knowingly and maliciously aided and abetted the unlawful employment practices, discrimination and retaliation, as described herein, committed against Plaintiff in violation of the NYSHRL.

152.     As a direct and proximate result, Plaintiff has suffered and continues to suffer monetary and/or economic harm, including, but not limited to, loss of past income, future income, compensation and benefits,  for which she is entitled to an award of monetary damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and costs.

153.     As a direct and proximate result, Plaintiff has suffered, and continues to suffer, emotional distress, for which she is entitled to an award of monetary damages and other relief.

### SIXTH CAUSE OF ACTION
**(Gender Discrimination Under the NYCHRL)**
*Against all Defendants*

154.     Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

155.    Defendants have discriminated against Plaintiff on the basis of her gender in violation of the New York City Human Rights Law ("NYCHRL") by subjecting her to disparate treatment based upon her gender, including, but not limited to, denying her equal terms and conditions of employment and subjecting her to disparate working terms and conditions while Plaintiff was working in Point72's offices in New York City.

156.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

157.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

158.    Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## SEVENTH CAUSE OF ACTION
**(Retaliation in Violation of the NYCHRL)**
*Against All Defendants*

159.    Plaintiff hereby repeats and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

160.    Ms. Bonner complained of Gorre's offensive and inappropriate behavior, including his regular practice of insulting and humiliating Ms. Bonner in front of subordinate male employees.  Ms. Bonner also complained to her supervisor about the fact that she was not promoted and was paid less because she is a woman.

161.    Despite Ms. Bonner's complaints about Gorre, he was permitted to remain on the promotion committee, which would ultimately decide whether Ms. Bonner would be promoted to Director.

162.    Ms. Bonner was ultimately denied a promotion to Director, a decision in which Gorre was intricately involved, and through which Gorre retaliated against Ms. Bonner for having complained about his inappropriate and unlawful conduct.

163.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

164.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress to which she is entitled to an award of monetary damages and other relief.

165.    Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

**EIGHTH CAUSE OF ACTION**
**(Aiding and Abetting Violations of the NYCHRL)**
***Against Defendants Cohen and Haynes***

166.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

167.    Defendants Cohen and Haynes knowingly and maliciously aided and abetted the unlawful employment practices, discrimination and retaliation, as described herein, committed against Plaintiff in violation of the NYCHRL.

168.    As a direct and proximate result, Plaintiff has suffered and continues to suffer monetary and/or economic harm, including, but not limited to, loss of past income, future income, compensation and benefits,  for which she is entitled to an award of monetary damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and costs.

169.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, emotional distress, for which she is entitled to an award of monetary damages and other relief.

170.    Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants for the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York and the City of New York;

B.    An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.    An award of damages against Defendant, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation, seniority and other benefits of employment;

D.      An award of damages against Defendant, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for Plaintiff's emotional distress;

E.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff, including, but not limited to, loss of income and other damages flowing from it, earned bonus pay, reputational harm and harm to professional reputation, in an amount to be determined at trial, plus prejudgment interest;

F.      An award of punitive damages and any applicable penalties and/or liquidated damages in an amount to be determined at trial;

G.      Prejudgment interest on all amounts due;

H.      An award of Plaintiff's reasonable attorneys' fees and costs; and

I.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: February 12, 2018
     New York, New York              Respectfully submitted,

                                    **WIGDOR LLP**

                                    By: _____
                                        Jeanne M. Christensen
                                        Michael J. Willemin
                                        Kenneth D. Walsh

                                    85 Fifth Avenue
                                    New York, NY 10003
                                    Telephone: (212) 257-6800
                                    Facsimile: (212) 257-6845
                                    jchristensen@wigdorlaw.com
                                    mwillemin@wigdorlaw.com
                                    kwalsh@wigdorlaw.com

                                    *Counsel for Plaintiff*